IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RONDA L. MARSH, and all others similarly situated;<br><br>        Plaintiff,<br><br>  vs.<br><br>PHELPS COUNTY, GENE SAMUELSON, Individually and in his official capacity as Sheriff; PENNY GREGG, AND Individually and in her official capacity as Phelps County Corrections Lieutenant; and LOUIS P. CAMPANAJR., Individually and in his official capacity as Corrections Officer;<br><br>        Defendants. | **4:16CV3032**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 10). Defendants Samuelson and Gregg argue they are entitled to summary judgment based on qualified immunity. Defendant Phelps County moves for summary judgment on all claims against it.

PROCEDURAL BACKGROUND

Plaintiff Ronda Marsh filed suit against Defendants Phelps County, Nebraska, Gene Samuelson ("Samuelson"), Penny Gregg ("Gregg"), and Louis Campana, Jr. ("Campana") pursuant to 42 U.S.C. § 1983. (Filing No. 1-1). Marsh alleges she was sexually assaulted by Defendant Campana, a corrections officer, while incarcerated at the Phelps County Jail. She further alleges Defendants Samuelson and Gregg, the Sheriff and jail administrator, respectively, were deliberately indifferent in violation of her Eighth and Fourteenth Amendment rights by failing to protect her from the known risk of harm presented by Campana (Id.) Marsh sued each defendant in their individual and official capacities. Defendants Samuelson and Gregg in their individual capacity, and Phelps County (encompassing all official capacity claims) have moved for summary judgment. (Filing No.

10). Defendants Samuelson and Gregg assert they are entitled to qualified immunity. Defendant Phelps County moves for summary judgment on all claims against it.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  See Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial.  See Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)) (internal marks omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 251-52 (internal citations omitted).

STATEMENT OF FACTS

As a preliminary matter, Defendants object to the evidence submitted by Plaintiff filed as Filing No. 16-3–16-19. In accordance with Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56.

The contested exhibits are interview reports from 16 witness interviews conducted by Nebraska State Patrol ("NSP") Investigator Clint Elwood. Investigator Elwood interviewed numerous potential witnesses during the 2012 investigation of Defendant Campana. Each of the interviews were summarized into these short reports.  Defendants object on the basis of hearsay, arguing that these exhibits do not contain any factual findings of the NSP but rather unsworn, summarized out-of-court statements. See Fed. R. Evd. 801(c).[1] Plaintiff has not responded to the defendants' objection or arguments.

Under Rule 56(e), if a fact is not properly supported by evidence, the court may still consider it for purposes of the motion only. Fed. R. Civ. P. 56(e)(2). "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). An out-of-court statement offered only to show that the defendant was on notice, and not to prove the truth of the matter asserted, is not hearsay. See Ahlberg v. Chrysler Corp., 481 F.3d 630, 637 n.3 (8th Cir. 2007). The court will consider the contested exhibits to the extent that they may be interpreted as putting Defendants on notice that Campana may have presented a substantial risk of harm to inmates.

---

[1] Defendant additionally argues that although Plaintiff's counsel submitted an affidavit in support of the documents swearing the information within the exhibits were correct and true, (see filing no. 16-1), under Rule 56 an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence[.]" Fed. R. Civ. P. 56. Defendant argues Plaintiff's counsel does not have personal knowledge of the truth or accuracy of the interviews or third party statements.

The undisputed material evidence of record, viewed in the light most favorable to Plaintiff, is as follows:

Defendant Samuelson was elected as Sheriff of Phelps County in 2011. As Sheriff, his statutory job functions included oversight of the Phelps County Jail operations, as well as other functions of the Sheriff's Office, including investigating criminal conduct. (Filing No. 11 ¶ 1 at CM/ECF p. 7). Defendant Gregg is a Lieutenant with the Phelps County Sheriff's Office. She has been employed with Phelps County since 1999 and has served as jail administrator since August 2001. As the jail administrator, Gregg manages the day-to-day operations of the Phelps County Jail. Gregg is certified in jail management.

Campana was hired as a correctional officer at the Phelps County Jail on or around April 21, 2010. Pursuant to Sheriff's Office hiring practices, a criminal background check was conducted before Campana was hired. The background check disclosed only a speeding citation; no felony convictions. Campana's job application and interview revealed work experience as a public school janitor, assistant manager at Sun Theater, and providing a host home for disabled persons with Mosaic. Gregg verified Campana's past and present employment. According to Gregg, Campana's reference checks were positive, and nothing about his background prompted any cause for concern. (Filing No. 11 ¶ 4 at CM/ECF pp. 6–7). But Gerrard Erickson, a corrections officer who had formerly worked with Campana and was a reference on Campana's application, notified Gregg that Campana might "possibly [have] problems working around females." (Filing No. 16-4 at CM/ECF p. 1).

After being hired, Campana successfully completed the jail's training program, including instruction on appropriate staff-inmate communications, ethics, facility policies and procedures, key control, and professionalism. (Filing No. 11 at CM/ECF p. 7). Campana reviewed and agreed to abide by Phelps County's personnel policies and codes of ethics which prohibit employees from violating the law, require professionalism, and specifically prohibit engaging in harassment or discriminatory acts. (Filing No. 11-2; Filing No. 11-7 at CM/ECF p. 21; Filing No. 11-11.). And for each year of his employment, Campana

completed four hours of required policy and procedure training and passed the yearly policy exams. (Filing No. 11-7 at pp. 36, 77).

Campana was subject to performance evaluations every six months during his employment at the jail. The performance evaluations assess multiple components of the employee's work, scoring each component from "1-Warning" to "5-Excellent," (with the middle ranking being "3-Satisfactory"). Campana received mostly satisfactory marks with a few "4-very goods" on his first evaluation dated January 20, 2011. (Filing No. 11-7 at CM/ECF pp. 39–41). The evaluation concluded that Campana could improve his work performance by being "less chatty with inmates." (Id. at CM/ECF p. 41). The marks on Campana's next evaluation, dated June 2, 2011, were again mostly satisfactory, but he was given two "2-conditional" marks for his ability to "control post" and "professionalism." (Id. at CM/ECF pp. 63–65). Regarding professionalism, the evaluation stated: "Needs to watch what he says over radio and out in the booking area. Have heard him curse over radio a couple of times. I have also had to tell him to watch his mouth out in booking. Inmates can hear our voices while in holding cells." (Filing No. 11-7 at CM/ECF p. 65). Campana received all satisfactory marks for his third evaluation dated November 17, 2011. (Filing No. 11-7 at CM/ECF p. 67–69). Under the section regarding judgment, his supervisor commented "Doing ok here. Does need to use better judgment when speaking to or around inmates. Limit time at female cell. Can open yourself up for a law-suite [sic]." (Filing No. 11-7 at CM/ECF p. 68). Regarding areas for improvement, his supervisor commented "Watch what is said around inmates/remember your [sic] not here to be a friend, be friendly but be professional." (Filing No. 11-7 at CM/ECF p. 69).  In May of 2012, Campana was promoted to Corporal. As part of the promotion he was subject to a three month probationary period to monitor his ability to perform supervisory duties.

On May 27, 2012, day shift correctional officer Lacey Stone sent an email to Gregg concerning the actions of a female inmate, Tammy Knight. Stone's email read

> Rita and I were watching the video from 104 on 05-25-2012 to figure out when someone got out of bed. While we were watching the video's for 05-21-2017 at 00:30 we noticed inmate tammy knight doing some very innapropriate things infront of the camera on the table seat and on her bunk. We also noticed that she has been getting up alot of night in just her Sports Bra and Boxers which is uncalled for. I didnt know how you would like to address the issue? I figured that maybe you might want to be notified about this issue. I'm not for sure who was in control that night, but maybe they should pay a little more attention or maybe they were? I don't know not my place to pass judgement. Just wanted you to be aware of what has and is going on some people have showed concern about the issue.

(Filing No. 16-2 at CM/ECF p. 1, Filing No. 11-12 ¶ 6 at CM/ECF p. 3)(errors in original). Stone's email contained no reference to Campana.

In response to Stone's email, Gregg reviewed the relevant surveillance video. (Filing No. 11-2 ¶ 7 at CM/ECF p. 3). When the screen was normal size, Gregg could not discern Knight's conduct, but when she enlarged the screen, Gregg saw that Knight was masturbating and did so for approximately 45 minutes. (Id.). Gregg also reviewed the surveillance camera which partially shows inside the master control office. (Id.). She identified Campana as the control officer on duty for the period of Knight's conduct. Gregg observed that Campana did not appear to be fixated on the monitors where Knight could have been seen, nor did Gregg observe any behavior to suggest that Campana was watching Knight on the video monitors. (Id.). Gregg observed a lot of movement in the control area during this time period, with the two floor officers who were also on duty that night coming into and out of the control office at least once during the pertinent time period. To Gregg, it appeared that the officers on night shift duty, including Campana, were performing normal duties, unaware of or ignoring Knight's actions. (Id.). Gregg reasoned that Knight might not have realized that she was in view of a camera and even if she knew where cameras were placed, she reasonably could have thought her actions would not be seen by correctional staff.

From Gregg's professional experience, she knew it was very common for inmates to masturbate in their cells, especially over the night shift when cellmates are sleeping. (Filing

No. 11-2 ¶ 9 at CM/ECF p. 3). According to Gregg, correctional officers often become desensitized to seeing inmates masturbate, and will permit the inmate privacy by ignoring the activity, or the officer may simply tell the inmate to cease the activity, unless the inmate is deliberately offending fellow inmates, or causing disruption. (Id.). Inmates are expected to maintain decency, however an isolated instance of masturbation is not categorically prohibited by jail rules that govern inmate behavior. Additionally, it would not normally result in discipline simply because the act was seen by a correctional officer during monitoring. (Id.).

Based on Gregg's professional experience, she determined the email and informal investigation did not supply any basis for corrective action against either Knight or any night shift staff member. Gregg did not believe there was sufficient basis to open a formal investigative file or investigate the matter further: She did not question Knight or Campana regarding the incident.

Gregg sent an email to Samuelson on May 29, 2012, to notify him of what she had done in response to Stone's email. The notice indicated Gregg did not believe any night shift officer engaged in misconduct. (Filing No. 11-2 ¶ 14 at CM/ECF p. 5). At the end of her email, Gregg stated, "I am troubled by staff watching cameras, I will attempt to get more information next time they are on." (Id.). Gregg was referring to her concern that day shift officers did not seem to have any legitimate reason to watch surveillance video from several days before. It was Gregg's impression that there was animosity between day shift and night shift workers. After receiving Gregg's email, Samuelson personally reviewed some the relevant video and agreed with Gregg's assessment that no disciplinary action was required. (Filing No. 11-1 at CM/ECF p. 2).

Under Phelps County Jail policies and procedures, corrections staff members are required to report any observed misconduct by other staff members. (Filing No. 11-2 ¶ 15 at CM/ECF pp. 5–6). Gregg encouraged staff to comply with this policy and investigated all such complaints. (Id.). However Gregg also discouraged false, unsupported, and/or purely

vindictive reports by staff members against one another. (Id.). At no time did any correctional officer at the jail provide a written report to Gregg or Samuelson regarding any suspicion that Campana was engaging in sexual misconduct with inmates.

Around May of 2012, officer Stephanie Johnson verbally expressed a concern regarding Campana to Gregg. (Filing No. 16-3). Johnson approached Gregg and asked to rotate shifts because she no longer wanted to work with Campana. (Filing No. 16-3 at CM/ECF p. 2). Johnson explained she was uncomfortable with the amount of time Campana spent interacting with the female inmates. Johnson said while Campana was in the control room, he would often request other corrections officers take over his position so that he may go and speak with female inmates who had requested his assistance. (Filing No. 16-3 at CM/ECF p. 2). Gregg told Johnson to write a report detailing the reasons she felt uncomfortable working with Campana, and they would discuss the matter further.  But Johnson did not file a report.

Earlier that month, Johnson reported to corrections supervisor Christi Meyer that she thought she had seen Campana place his arm around a female inmate. (Filing No. 20-3). Meyer investigated Johnson's claim by reviewing video footage and did not observe any physical contact between Campana and the inmate. (Filing No. 20-3). When discussing Meyer's observations, Johnson admitted she must have been mistaken due to her indirect view, and she withdrew her complaint. (Filing No. 20-3). Based on her investigation and Johnson's withdrawal, Meyer did not document Johnson's complaint or the investigation. (Filing No. 20-3 at CM/ECF p. 2). Johnson informed Gregg of this prior claim when requesting the shift change. Gregg told Johnson to write a report concerning the claim if she believed the matter should be investigated further: Johnson did not submit a report. Johnson's verbal reports to Gregg were never disclosed to Samuelson.

Plaintiff Ronda Marsh served a five-day sentence at the Phelps County Jail from June 22, 2012 to June 27, 2012.  During her five-day incarceration, Marsh did not submit any complaints to jail staff or management regarding being subjected to or having observed any

sexual misconduct. Marsh was housed at the Phelps County Jail briefly on two prior occasions; in December of 2011 and April of 2012. (See Filing Nos. 11-3 & 11-4). During her past incarcerations, Marsh never reported being subjected to or witnessing any sexual misconduct.

On July 11, 2012, Gregg returned a call to former inmate Mindi Baker. Baker served time at the Phelps County Jail from July 1-5, 2012, and left a message for Gregg asking to discuss some property she was missing following her release. At the end of the conversation, Baker told Gregg she believed Campana "acted inappropriately with the girls." (Filing No. 11-12 ¶¶ 21, 23 at CM/ECF p. 7–8). When asked for details, Baker described Campana's inappropriate conduct as giving candy to female inmates out of camera view, making kissing gestures, asking her for a hug, and pinching the nipple of female inmate Marjory Northrop.

To the best of Gregg's personal knowledge, the complaint from Baker on July 11, 2012, was the first time that anyone had complained of inappropriate sexual behavior by a correctional officer at the Phelps County Jail during Gregg's employment with the County. (Filing No. 11-12 ¶ 22 at CM/ECF p. 7).

Gregg immediately advised Samuelson of Baker's claim, and began to investigate by attempting to contact former inmate Northrup, and by privately interviewing inmate, Laura Rinehart. Rinehart informed Gregg that she had observed Campana touching female inmates inappropriately while out of camera view. And Samuelson personally interviewed Rinehart shortly after. That same day, Samuelson contacted Campana and advised him that he would be on paid suspension pending an investigation into a complaint made against him.

Gregg and Samuelson reviewed all the video available from the previous 30 days that showed Campana in the areas of the jail where females are housed. They did not see any overtly sexual contact between Campana and any female inmate on the surveillance video. However, Gregg and Samuelson were concerned by one portion of video which appeared to depict some kind of physical contact between Campana and a female inmate while he was

seated at a table with a group of female inmates. Another video segment prompted concern because it showed Campana spending an unusual amount of time inside a cell in a relaxed posture and conversing with several female inmates.

On July 13, 2012, Samuelson contacted the Nebraska State Patrol and requested they take over the investigation. Campana was formally placed on administrative leave without pay on July 17, 2012. Over the next two months, the NSP conducted interviews of current and former female inmates and correctional staff members. The NSP investigation revealed that outside of the view of surveillance cameras, Campana was using an emergency key to access a side door which provided access into the female housing area, and Campana then had multiple off-camera sexual contacts and other inappropriate contacts with female inmates between approximately March and July of 2012, most frequently with inmate Tammy Knight. (Filing No. 11-1 at CM/ECF p. 4). Knight later disclosed that Campana had sexual contact with inmates within the field of view of the jail's security cameras, (Filing No. 11-20 at CM/ECF p. 7), but hidden from actual viewing by obstacles such as the medication cart. (Id.).

Campana resigned his employment by letter on September 28, 2012. At the time Campana submitted his resignation, Samuelson had already decided to terminate Campana based upon findings from the NSP investigation—Samuelson had prepared a termination letter on September 27, 2012 which was under review of the County Attorney. Samuelson accepted Campana's resignation on October 1, 2012. Campana's last actual work day was July 10, 2012—the day before Baker made her complaint to Gregg.

On November 6, 2012, a criminal action was filed against Campana alleging eight felony counts under Neb. Rev. Stat. § 28-322.02, and § 28-322.03, which make it a crime to subject an inmate to sexual penetration or contact. Counts I, II, and V of the criminal information alleged Campana subjected Plaintiff Marsh to sexual penetration or contact on or about June 22, 2012 to June 27, 2012. Counts III, IV, VI, VII, and VIII alleged Campana subjected other inmates to sexual penetration or contact, between March 22, 2012 and June

27, 2012. Campana pled guilty to Counts VII and VIII which alleged he had sexual contact with Tammy Knight and Marjory Northrop. As part of the plea agreement, all other Counts of the criminal information were dismissed.

Plaintiff Marsh was deposed in Campana's criminal case. In her sworn deposition, Marsh identified one date that Campana subjected her to sexual contact in June of 2012. Marsh stated she never filed any complaint about this incident. (Filing No. 11-19 at CM/ECF pp. 8–9).

LEGAL ANALYSIS

Marsh alleges that Gregg and Samuelson failed to protect her from the substantial risk of harm that Campana presented to herself and other inmates. (Filing No. 1-1). Gregg and Samuelson assert they are entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Government officials are entitled to qualified immunity unless 1) plaintiff has "asserted a violation of a constitutional right; (2) the alleged right is clearly established; and (3) there exists a genuine issue of material fact as to whether the official would have known that his alleged conduct would violate the plaintiff's clearly established right." Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations omitted). In other words, "qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and the information [he or she] possessed." Id. (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)). "The qualified immunity standard 'gives ample room for mistaken judgments[.]'" Smithson, 235 F.3d at 1061 (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

Marsh alleges that Gregg and Samuelson's conduct violated her Eighth and Fourteenth Amendment rights. The parties disagree as to whether Marsh was a pretrial detainee or a sentenced prisoner; that is, whether her claims arise under the Fourteenth or Eighth Amendment. For purposes of our analysis, the distinction is irrelevant. The Eighth Circuit has previously determined the Fourteenth Amendment provides detainees "at least as many protections" as afforded to prisoners under the Eighth Amendment. Hott v. Hennepin County, Minnesota, 260 F.3d 901, 905 (8th Cir. 2001). Accordingly, we analyze the Fourteenth Amendment claims under the standards applied to prisoner Eighth Amendment claims.

"[T]he Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from [violence]." Young v. Selk, 508 F.3d 868, 871–72 (8th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)); see also Lenz v. Wade, 490 F.3d 991, 995 (8th Cir. 2007). A prison official's "deliberate indifference" to a prisoner's "substantial risk of serious harm" is unreasonable and violates the Eighth Amendment. Young, 508 F.3d at 872 (quoting Farmer, 511 U.S. at 828). The plaintiff must make a two part showing to prove deliberate indifference: "The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires the inmate to prove that the prison officials had a 'sufficiently culpable state of mind.'" Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008) (quoting Farmer, 511 U.S. at 834).

Regarding the first requirement, it is beyond dispute that a sexual assault is sufficiently serious to constitute a deprivation of Marsh's constitutional rights. See Walton v. Dawson, 752 F.3d 1109, 1119 (8th Cir. 2014).

Under the second requirement, "[a] prison official may be held liable . . . if he or she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Coleman v. Rahija, 114 F.3d 778, 785 (8th

Cir. 1997). An official can be held liable if he knows of a substantial risk of harm: "'[A] plaintiff is not required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of harm." Nelson v. Shuffman, 603 F.3d 439, 447 (8th Cir. 2010) (quoting Kahle v. Leonard, 477 F.3d 544, 551 (8th Cir. 2007)).

The defendant official must be both "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also draw the inference.'" Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003) (quoting Farmer, 511 U.S. at 837) ; see also Norman v. Schuetzle, 585 F.3d 1097, 1105 (8th Cir. 2009)("While a factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious, . . . the prison official must still draw the inference.") "This subjective state of mind must be present before a plaintiff can be successful because only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." Blades v. Schuetzle, 302 F.3d 801, 803 (8th Cir. 2002) (citation omitted). "This requisite state of mind is akin to recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmates." Lenz, 490 F.3d at 995 (citing Farmer, 511 U.S. at 835, 839-40).

Government employees are personally liable for only their own misconduct. Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010). Therefore, the doctrine of qualified immunity requires "an individualized analysis of each officer's alleged conduct." Walton, 752 F.3d at 1125. We address each prison official's entitlement to qualified immunity individually.

1. Sheriff Gene Samuelson.

Sheriff Samuelson became Sheriff in 2011 and was not personally involved in the hiring of Campana. And Samuelson does not generally become involved in personnel matters concerning corrections staff or day-to-day incidents unless Gregg requests his assistance. Apart from the Knight incident and Baker's claim, Samuleson never received any reports,

13

written or verbal, detailing inappropriate or suspicious conduct by Campana. And Samuelson received no notice of Johnson's verbal claims

Samuelson received Gregg's email detailing the Knight incident on May 29, 2012. The email described Gregg's investigation and stated that she did not believe Campana or any other night-shift officer had engaged in misconduct. Samuelson personally reviewed some of the surveillance video from this event and agreed with Gregg's assessment that no disciplinary action was needed against staff or Knight. (Filing No. 11-1 at CM/ECF p. 2). Plaintiff argues the Knight incident shows Samuelson had knowledge that Campana presented a risk of sexual assault to inmates. But based upon Gregg's email and Samuelson's own review of the video, Samuelson did not believe that Campana or any other officer had engaged in misconduct.

Samuelson learned of Baker's claim immediately after it was made. Baker's claim was the first time anyone made a complaint of sexual misconduct by a corrections officer during his tenure. That same day, Samuelson suspended Campana's employment; assisted in reviewing jail camera footage; and personally spoke with Rinehart regarding the allegations. Even though Samuelson and Gregg did not observe any overtly sexual contact in the videos, they did not end the investigation: Campana remained on leave and Samuelson turned the investigation over to the NSP on July 13, 2012—two days after the initial complaint. In September, after receiving reports from the NSP investigation, Samuelson decided to terminate Campana's employment.

The evidence fails to show that before Baker's claim, Samuelson was aware of facts from which the inference could be drawn that Campana's employment posed a substantial risk of serious harm. Samuelson was only personally aware of the incident involving Knight, even if it was enough to raise a possible inference that Campana posed a substantial risk of harm to Knight or other inmates, Samuelson did not draw such an inference after reviewing the evidence, including video evidence. That evidence supported his conclusion that no misconduct had taken place. Even if the facts permit a reasonable jury to find that Samuelson

and Gregg should have more thoroughly investigated the incident, such by interviewing either Knight or Campana, that finding is, as a matter of law, it is insufficient to support deliberate indifference.

Once Samuelson became aware of Baker's complaint, he took quick actions to investigate: Campana was placed on leave; Samuelson personally questioned one of the alleged victims; he assisted in the review of video; and he turned the investigation over to another agency for further determination. Viewing the facts in a light most favorable to Plaintiff, the court cannot find that Samuelson was deliberately indifferent or acted recklessly in failing to protect Plaintiff.[2]

2.  Lieutenant Penny Gregg.

Gregg was personally involved in the hiring process of Campana. She verified Campana's employment at Sun Theater by speaking with a manager there with whom she was familiar—she did not speak to Suzy McConnell who was listed as a reference on Campana's application. (Filing No. 20-1 at CM/ECF p. 2). She also spoke with Erickson, Campana's former co-worker who was employed as a corrections officer. Erickson was listed on Campana's application as a reference. In his interview with NSP, Eriskon claimed he had informed Gregg that Campana may have problems working with females. But there is no evidence showing whether Erickson explained this comment and according to Gregg, Campana's application and reference checks were positive.

Marsh argues that Gregg had notice Campana posed a risk to inmates at the time of his hiring because (1) Campana's manager and application reference, Suzy McConnell, had fired him from Sun Theater for watching pornography; and (2) his former theater co-worker,

---

[2] The court notes that Marsh cites Neb. Rev. Stat. § 47-115 in her brief multiple times to support her contention that as Sheriff Samuelson is ultimately responsible for misconduct of Campana. Marsh did not allege a state law negligence claim within her complaint and Neb. Rev. Stat. § 47-115 has no legal bearing on the determination of a claim arising under 42 U.S.C. § 1983.

Angela Robinson, informed Gregg she did not want to work the same shift as Campana when she applied to be a corrections officer at the jail. (Filing No. 16 at CM/ECF pp. 4–9). Even accepting these matters as true, both occurred after Campana was hired. Campana was still working for Sun Theater when he was hired to work for Phelps County and there is no evidence indicating when he was caught watching pornography and fired. (See filing no. 11-7 at CM/ECF p. 2). Additionally, there are no facts suggesting that Gregg or anyone at Phelps County was informed of Campana's removal from his employment with Sun Theater or the reason for his removal. And as to Robinson's concerns, her statement was made to Gregg in November of 2012—years after Campana was hired and months after the investigation had begun, (see filing no. 16-3 at CM/ECF p. 2; filing no. 16-6). There is no evidence that Robinson made any statements to Gregg or Phelps County staff prior to November of 2012. According to the evidence presented, neither of these after-the-fact events would have placed Gregg on notice.

Throughout Campana's employment, Gregg received Campana's performance evaluations. The evaluation comments indicated that Campana was talkative and friendly with inmates, spent extra time at female cells, and used unprofessional language, (Filing No. 11-7 at CM/ECF pp. 41, 65, 68 & 69), but they were mostly satisfactory and mentioned nothing indicating actual or suspected improper sexual contact. Two of the evaluations suggested Campana had room to improve his professionalism and judgment and must spend less time with female inmates, but these were 'areas for improvement' and were not deemed to warrant discipline.

Gregg received notice of Johnson's complaint in May of 2012. Johnson verbally complained that she no longer wanted to work on the same shift as Campana due to the amount of time he spent answering female inmates' requests to talk in their cells. Gregg also knew that Johnson claimed to have seen Campana place his arm around a female inmate, but following an investigation, this claim was invalidated and withdrawn by Johnson. Gregg offered to investigate both matters further if Johnson decided to file a report: Johnson did not.

Regarding the Knight incident, Gregg treated the matter seriously and investigated the claim. Based upon Gregg's professional experience and review of the relevant video, Gregg concluded that no misconduct had taken place.

Campana was employed as a corrections officer for over two years. But it is undisputed that no inmate, including Marsh, communicated or complained that Campana was engaging in inappropriate sexual behavior or harming or harassing inmates until Baker's claim on July 11, 2012. There similarly was never any written report by other corrections officers concerning sexual misconduct or inappropriate behavior by Campana. Even if this court were to consider all of the interview reports submitted by Plaintiff as evidence that Campana often used sexually explicit language and told sexually charged stories, (see filing nos. 16-4–16-13), there is no evidence showing that Gregg personally witnessed this conduct or that written complaints were ever filed which would have placed Gregg on notice of Campana's sexual banter. And regardless, the court is not convinced notice of inappropriate sexual banter equates with or provides notice of a risk of improper sexual contact.

The record contains no evidence that Gregg was aware of or ever received a claim or complaint of sexual misconduct by Campana. Nor is there evidence that any other claims of misconduct made against Campana were substantiated (until Baker's claim). The concerns addressed by Stone and Johnson were independently investigated and misconduct was not found in either instance. The facts presented, taken in the light most favorable to Marsh, do not permit a reasonable jury to find that Gregg acted recklessly and was subjectively aware that Campana posed a risk of harm to inmates. See Farmer, 511 U.S. at 837.

Gregg and Samuelson are each entitled to qualified immunity. Summary judgment will be granted on Plaintiff's claims against Gregg and Samuelson in their individual capacities.

<u>Official Capacity Claims.</u>

Marsh filed suit against Samuelson, Gregg, and Campana in their official capacities. A claim against these governmental employees in their official capacity is, in reality, a claim against Phelps County.  See Parrish v. Luckie, 963 F.2d 201, 203 n.1 (8th Cir. 1992) ("Suits against persons in their official capacity are just another method of filing suit against the entity."). Phelps County moves for summary judgment on all claims.

A municipality can be liable under Section 1983 only if a municipal policy or custom caused a plaintiff to be deprived of a federal right or if the municipality failed to adequately train its employees. Snider v. City of Cape Girardeau, 752 F.3d 1149, 1160 (8th Cir. 2014) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989); Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

Regarding her official capacity claims, Marsh alleges within her complaint:

42. The Defendants did not vigorously enforce and/or did not have a no contact policy between inmates and correctional staff.

43. The Defendants failed to provide adequate training and/or supervision to prevent sexual assaults by corrections officers on inmates.

44. The Defendants knew or should have known that security cameras in the facility were improperly placed, and/or that aspects of the layout of the facility permitted Campana to have unlimited, unmonitored access to prisoners placing them at an unreasonable risk of harm.

(Filing No. 1-1 at CM/ECF p. 8). She further argues that the County has a lack of policy and safeguards to ensure that sexual assaults do not occur.

1.  County Policy or Custom.

Phelps County may be liable under Section 1983 if a "policy" or "custom" caused a violation of Plaintiff's constitutional rights.  Doe By and Through Doe v. Washington Cnty.,

18

150 F.3d 920, 922 (8th Cir. 1998) (citing Monell, 436 U.S. at 694).  To be liable, "the plaintiff must show not only that a policy or custom existed, and that it was casually related to the plaintiff's injury, but that the policy itself was unconstitutional." Luckert v. Dodge County, 684 F.3d 808, 820 (8th Cir. 2012)(citations omitted).

An "official policy" involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy.   Jane Doe A By and Through Jane Doe B v. Special School Dist. of St. Louis Cnty., 901 F.2d 642, 645 (8th Cir.1990) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). A governmental custom involves:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Jane Doe, 901 F.2d at 646. "The existence of a custom may be found in 'persistent and widespread . . . practices . . . which are so permanent and well settled as to have the force of law.'" Thelma D. v. Board of Ed., 934 F.2d 929, 932 (8th Cir. 1991) (quoting Monell, 436 U.S. at 691) (citations omitted).

First, Marsh generally alleges that the County failed to ensure that 'safe' individuals were hired for the position of corrections officer. (Filing No. 16 at CM/ECF p. 37). She also claims the County failed to implement a policy and safeguards to protect inmates from sexual assault. (Id.).

Phelps County policy requires that corrections officers be free of felony convictions and remain so throughout employment. (Filing No. 11-2 at CM/ECF p. 1). Prior to hiring

Campana, Phelps County conducted a background check which revealed no criminal convictions. (Filing No. 11-2 at CM/ECF p. 2). Gregg checked Campana's references and confirmed his job history and found nothing of concern. (Filing No. 11-2 at CM/ECF p. 2). Erickson, a reference and former co-worker, told NSP in November 2012 that as one of Campana's references, he had informed Gregg that Campana may "possibly [have] problems working around females," but there is no record of whether Erickson clarified or provided further information regarding this statement. (Filing No. 16-4 at CM/ECF p. 1).

Marsh argues the County knew Campana was dangerous at the time of his hiring because (1) his manager and application reference, McConnell, had fired him from Sun Theater for watching pornography; and (2) his former theater co-worker, Angela Robinson, informed Gregg she did not want to work the same shift as Campana when she applied to be a corrections officer at the jail. As discussed above, these events happened after Campana was hired and therefore could not have affected the County's determination in hiring Campana.

The evidence presented, viewed in the light most favorable to Marsh, is not sufficient to find that Phelps County had an unconstitutional custom or policy of hiring unsafe employees nor is there evidence to find that this alleged custom caused Marsh's injury.

Marsh additionally claims that Phelps County allowed the sexual assault to occur through the County's failure to have policies to protect inmates from sexual assault and failure to have a specific "no contact" policy between inmates and corrections officers.

Phelps County policies require employees to abide by all laws. (Filing No. 11-11 at CM/ECF pp. 3, 10). Nebraska state law prohibits sexual contact between correctional officers and inmates, consensual or otherwise, and makes such conduct a felony. Neb. Rev. Stat. § 28-322.02, & § 28-322.03. Additionally, policies for the jail include provisions that corrections officer "will not degrade or intimidate inmates/detainees, show favoritism to individual inmates/detainees, nor gossip with inmates/detainees about other

inmates/detainees or personnel[,]" (Filing No. 11-2 at CM/ECF p. 15), and that officers will not engage in "behavior which conflicts with the interests of the jail facility." (Filing No. 11-2 at CM/ECF p. 4). Phelps County corrections officers are subject to disciplinary action for "immoral or indecent behavior during work hours on County property." (Filing No. 11-11 at CM/ECF p. 9). Overall, corrections officers were expected to maintain a professional demeanor. (Filing No. 11-2 at CM/ECF pp. 4, 6; Filing No. 11-11 at CM/ECF p. 8).

Contrary to Marsh's claims, the County was not constitutionally required to specifically incorporate training and/or policies that prohibit corrections officers from touching or assaulting inmates. See Andrews v. Fowler, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the City to specifically train officers not to rape young women").

To protect inmates further, Phelps County had procedures in place for both inmates and corrections officers to report inappropriate or illegal actions taken by a corrections officer. (Filing No. 11-2 at CM/ECF p. 6; Filing No. 11-11 at CM/ECF p. 11; Filing No. 11-9 at CM/ECF pp. 1, 2–3 ). And there is no evidence to suggest Phelps County employees had a custom of covering up allegations of employee misconduct or suppressing inmates' complaints. To the contrary, the evidence shows that when Gregg, Samuelson, and other supervisors received complaints of misconduct, they took steps to address and investigate the claims. Since at least 2001, no inmate or corrections employee reported inappropriate sexual conduct by a correctional officer at Phelps County Jail until Baker's claim. (Filing No. 11-12 ¶ 22 at CM/ECF p. 7).

Based on the above, there is insufficient evidence to find that Phelps County had an unconstitutional custom or policy of allowing or failing to protect against sexual assault or that this alleged custom caused Marsh's injury.

Finally, Marsh argues the County failed to have security cameras properly placed throughout the jail thus allowing Campana to assault inmates out of camera view.

Phelps County policy provided for electronic surveillance through a video monitoring system throughout the facilities. The Nebraska Minimum Jail Standards for Adult Facilities advises against surveillance in certain areas of a jail to protect inmate privacy (Filing No. 11-16 at CM/ECF p. 1), and in early 2012, Phelps County Jail was found to be in full compliance with Nebraska Jail Standards. (Filing No. 11-8 at CM/ECF p. 1).

Marsh provides no statements or arguments regarding the specific placement of cameras that Marsh states was unconstitutional and the parties do not cite, nor can the court find, law stating the constitution requires every part of a jail to be monitored with security cameras. To the contrary, Nebraska administrative code advises against cameras in some areas of a jail. 81 Neb. Admin Code § 15-006.17. The court also notes that at times, Campana would engage in sexual misconduct with inmates in front of cameras by purposefully obstructing the camera's view with obstacles such as a medication cart. (Filing No. 11-20 at CM/ECF p. 7).

Based upon the above, the court finds insufficient evidence to support Plaintiff's claim against the County based on an unconstitutional custom or policy, or that alleged policy deficiencies violated her rights and caused the sexual assault.

2.  Inadequate Training.

"[A] local government may be subject to § 1983 liability for 'inadequate training of its employees.'" Parrish v. Ball, 594 F.3d at 997 (quoting City of Canton v. Harris, 498 U.S. 378, 388 (1989)). Inadequate training occurs when

(1) the county's ... training practices were inadequate; (2) the county was deliberately indifferent to the rights of others in adopting them, such that the "failure to train reflects a deliberate or conscious choice by the county;" and

(3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.

Parrish, 594 F.3d at 997 (citations omitted). To satisfy this standard, the plaintiff must demonstrate that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the county can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. In other words, the plaintiff must "demonstrate that the county had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Andrews, 98 F.3d at 1076.

Other than the legal conclusion provided in the complaint, Marsh provides no facts or evidence to show that Phelps County failed to provide adequate training to its employees. Evidence provided by the defendants shows that the county provided training of its employees upon hiring, including a specific course on ethical behavior for corrections officers, (filing no. 11-7 at CM/ECF pp. 56–62, & 78), and required at least four hours of review training each year of employment. (Filing No. 11-7 at CM/ECF pp. 36, 77). And Baker's complaint was the first complaint of sexual misconduct in Gregg's ten-year tenure as jail administrator. (Filing No. 11-12 ¶ 22 at CM/ECF p. 7). There is no evidence presented showing Phelps County had notice that its training was so inadequate that a sexual assault of inmates was likely to occur. Marsh has failed to present evidence supporting a genuine issue of fact concerning inadequate training by Phelps County.

Accordingly,

IT IS ORDERED:

1)      The Motion for Summary Judgment, (Filing No. 10), filed by Samuelson and Gregg in their individual capacities, and by Defendant Phelps County, including Samuelson and Gregg in their official capacities, is granted in its entirety.

2)      Plaintiff's claims against Campana in his individual capacity remain.

3)      A telephonic conference with the undersigned magistrate judge will be held on December 20, 2016 at **11:45 a.m.** to discuss further case progression. To participate in the call,

> Dial 1-877-336-1828.
> Enter the access code 5957780, then hit the # key.
> Enter the security code: 3032
> Press (1) to accept. Press (2) to re-enter.

4)      The clerk shall mail a copy of this order to Louis P. Campana, Jr., 311 E. 3rd. Street, Apt. 7, Grand Island, Nebraska, 68801. (See Filing Nos. 21 and 22).

December 8, 2016

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

24